# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**VALERIE J. PANTHER,**

            **Plaintiff,**

                                 **CIVIL ACTION**

     **vs.**                            **No. 04-2183-JWL**

**SYNTHES (U.S.A.), SYNTHES**
**(U.S.A.) EMPLOYEE BENEFIT**
**PLAN, and SUN LIFE ASSURANCE**
**COMPANY OF CANADA,**

             **Defendants.**

## MEMORANDUM AND ORDER

      Plaintiff Valerie J. Panther filed this action against defendants Synthes (U.S.A.),[1] Synthes (U.S.A.) Employee Benefit Plan, and Sun Life Assurance Company of Canada pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461.[2] While employed with defendant Synthes (U.S.A.) ("Synthes"), plaintiff participated in an employee benefit plan which provided long-term disability benefits to eligible participants. Defendant Sun Life Assurance Company of Canada ("Sun Life") underwrote the benefits and made all disability determinations. Pursuant to 29 U.S.C. § 1132(a)(1)(B), plaintiff seeks judicial review of defendant Sun Life's decision denying her long-term disability benefits. Specifically,

---

[1]     Plaintiff eliminated Synthes (U.S.A.) as a defendant when she filed her First Amended Complaint (Doc. 28).

[2]     The case was transferred to the undersigned judge after the death of Judge G. Thomas VanBebber.

defendant Sun Life concluded that plaintiff failed to present satisfactory proof that she was unable to perform the material and substantial duties of her own occupation.

The case is before the court on defendant Sun Life's motion for summary judgment (Doc. 22). For the reasons set forth below, the motion is denied and the case is remanded to Sun Life for further proceedings consistent with this opinion.

## I. Factual Background[3]

Synthes, an international medical device company specializing in the development, manufacturing, and marketing of orthopedic implants and instruments, employed Ms. Valerie Panther as a medical sales consultant from August 1991 until October 2002. Synthes maintained an employee welfare benefit plan (hereinafter "the LTD plan") that provided to eligible employees, among other things, benefits in the event of total disability. The disability benefits were funded by a group policy of long-term disability insurance issued to Synthes by Sun Life. The LTD plan and Summary Plan Description ("SPD") provided the following definition of total disability:

> Total Disability or Totally Disabled means during the Elimination Period and the next 60 months of Total Disability, the Employee, because of Injury or Sickness, is unable to perform all of the material and substantial duties of his own occupation. After benefits have been paid for 60 months, the Employee will continue to be Totally Disabled if he is unable to perform all the material and substantial duties of any occupation for which he is or becomes reasonably qualified for by education, training or experience.

Additionally, the terms of the LTD plan and SPD provided that a participant's "[p]roof [of disability] must be satisfactory to Sun Life" and that benefits were payable "when Sun Life receives satisfactory Proof of Claim."[4]

---

[3]     These facts are taken from the administrative record in Ms. Panther's case.

[4]     The SPD names Synthes (U.S.A) as the plan administrator, but Sun Life states that it effectively served as a plan administrator for limited purposes. In particular, Sun Life acknowledges that it acted as a fiduciary: it exercised discretionary authority with respect to eligibility determinations and it funded the benefits.

At all times relevant to this lawsuit, Ms. Panther was a participant of the LTD plan.  In April 1999, Ms. Panther asserts that she felt a ripping sensation in her lower back after lifting a medical instrument tray out of the trunk of her car.  She contacted Dr. Paul Arnold, a neurosurgeon at the University of Kansas Medical Center, who ordered her to undergo an MRI.  The MRI revealed that at L5-S1, Ms. Panther suffered from loss of disc space height and signal intensity consistent with degenerative disc disease, as well as a small right paramedian disc protrusion resulting in right lateral recess stenosis.  As a result, Dr. Arnold recommended an L5-S1 posterior lumbar interbody fusion.  Ms. Panther, however, elected to postpone surgery because she thought she was too young to have the procedure, she believed the surgery would worsen her condition, and she had just given birth to her first child in September of 1998.  Instead, Ms. Panther began an extensive rehab stretching regimen.  She continued to work as a medical sales consultant at Synthes for the next three years.  On October 7, 2002, Ms. Panther gave birth to her second child.  After her maternity leave ended, she did not return to work because of her back problems.

On January 27, 2003, Ms. Panther submitted a claim to Sun Life for long-term disability benefits, alleging that she was totally disabled from performing the material and substantial duties of her own occupation since October 1, 2002.  Ms. Panther relied on Dr. John Dunlap, an internal medicine specialist and her primary treating physician, to support her claim.  In a letter to Sun Life, Dr. Dunlap opined that Ms. Panther was unable to perform all of the material and substantial duties of her occupation.  He evaluated Ms. Panther on November 20, 2002 and December 2, 2002 because of her complaints of severe back pain.  From those visits, Dr. Dunlap diagnosed Ms. Panther with bilateral lumbar radiculopathy and degenerative disk disease at L5-S1.

3

Dr. Dunlap completed an attending physician statement for Ms. Panther dated January 27, 2003.  He stated that Ms. Panther's disability commenced on November 17, 2002, citing the 1999 MRI as objective evidence of a degenerative disc at L5-S1 and Ms. Panther's subjective symptoms of chronic lumbar pain which exacerbated with lifting and prolonged standing.  Dr. Dunlap noted that Ms. Panther was ambulatory, her condition had not changed since his prior exams, and that her treatment consisted of oral corticosteriods and a home exercise program that incorporated walking and swimming.  Dr. Dunlap checked several boxes on the form to reflect Ms. Panther's physical restrictions and limitations.  He marked that, in a normal day, Ms. Panther could stand or walk for one to four hours, sit for one to three hours, and drive for one to three hours.  Moreover, he checked that Ms. Panther could climb, push, pull, balance, and kneel 34% to 66% of an eight hour day, and bend, squat, crawl, reach and twist her body 1% to 33% of an eight hour day.  With these restrictions, Dr. Dunlap determined that Ms. Panther could lift a maximum of ten to fifteen pounds and could not work an eight hour day.  He concluded that Ms. Panther's physical impairments put her in "Class 5," defined as an individual with severe functional capacity limitations, incapable of minimum, sedentary activity.  Dr. Dunlap believed that Ms. Panther did not possess the capability to perform another occupation on a full-time or a part-time basis.

On May 13, 2003, Dr. Robert Foster, in-house physician for Sun Life, responded to several questions posed by Sun Life concerning Ms. Panther's medical condition.  First, Sun Life asked Dr. Foster if the restrictions and limitations listed on Dr. Dunlap's attending physician statement were supported and reasonable.  Dr. Foster opined that "the medical documentation in the file is not the standard documentation for someone with a severe back problem who is totally incapable of doing her job at the present time when she was able to do it previously."  He characterized Ms. Panther's physical examinations as "sketchy and incomplete." Dr.

4

Foster suggested that Ms. Panther be examined by an orthopedist or neurosurgeon, as opposed to an internist like Dr. Dunlap. Sun Life also asked Dr. Foster if Ms. Panther's pregnancy may have temporarily intensified her back problems. In response, Dr. Foster stated that the answer is "frequently yes," and in "most cases, although not always," the symptoms subside after pregnancy. Lastly, Sun Life asked Dr. Foster if Ms. Panther had received appropriate treatment and care for her back condition. Dr. Foster answered "maybe, maybe not," citing a lack of clear records with regard to a physical therapy program and the absence of a formal reading of Ms. Panther's 1999 MRI. Again, Dr. Foster recommended that Ms. Panther be evaluated by a neurosurgeon, orthopedist, or spine surgeon, and have that doctor complete an attending physician statement regarding Ms. Panther's restrictions and limitations. He also believed that a repeat MRI could provide more objective evidence regarding the alleged dramatic change in Ms. Panther's back condition.

On May 22, 2003, Sun Life requested MLS National Medical to schedule Ms. Panther for an independent medical evaluation with a neurosurgeon. MLS National Medical scheduled Ms. Panther to see Dr. Robert Beatty, a neurosurgeon with a spine specialty. Internal memorandums from Sun Life reflect that Ms. Panther objected to Dr. Beatty for unspecified personal reasons and because he did not have a spine fellowship. The memos indicate that Sun Life initially tried to find another doctor with a spine fellowship, but it later decided to conduct a face-to-face interview with Ms. Panther and to obtain Dr. Paul Arnold's treatment records.[5]

On July 10, 2003, Sun Life informed Ms. Panther that it had approved her long-term disability benefits claim, finding that she became disabled on November 20, 2002. Sun Life stated that Ms. Panther was entitled

---

[5]     Dr. Arnold later responded to Sun Life that he had treated Ms. Panther several times, prescribed her medications for her back from time to time, but that no formal treatment notes existed.

to a monthly benefit check for $12,287.67, subject to ongoing proof of total or partial disability.  To determine

if she continued to qualify for benefits, Sun Life  periodically required Ms. Panther to complete statements of

information and activity questionnaires, to produce updated attending physician statements, and to supply any

other proof that Sun Life demanded.  In an internal memo dated July 10, a Sun Life employee noted that Ms.

Panther's medical file consisted of only one MRI from Dr. Arnold in 1999 and three office visits with Dr.

Dunlap, including Dr. Dunlap's attending physician statement.  The employee commented that there was not

enough information in Ms. Panther's file to deny the claim and that Sun Life would "go forward with the claim

being approved and proceed with management of the claim using vocational resources [to] get an exact picture

of what her job requires [because] the duties she is claiming seem out of scope and a bit unreasonable."  The

employee stated that "[o]nce the exact duties are determined there may be accommodations that can be made

or the claim may be deniable at that point . . . ."[6]

In November 2003, Sun Life ordered a job analysis because Ms. Panther's stated job duties did "not

seem to match the ER job description."  That same month, Dr. Dunlap submitted another attending physician

statement to Sun Life, as well as his treatment notes from May through September 2003.  Dr. Dunlap's

attending physician statement was substantially similar to his statement in January 2003.  He still rated Ms.

Panther's limitations in the Class 5 range, noting that her progress was unchanged and that her condition was

chronic.

On November 30, 2003, Karla Forgiel, a vocational rehabilitation consultant, provided a job analysis

---

[6]      Between July 1 and July 3, 2003, Sun Life arranged for a surveillance investigation at Ms. Panther's
residence.  The only activity of any significance captured by the surveillance was footage of Ms. Panther
watering her lawn.  Sun Life scheduled another surveillance for three days in October 2003.

concerning how the occupation of "sales consultant" is routinely performed in the labor market.

Initially, Ms. Forgiel discussed Ms. Panther's job requirements as reported by both Synthes and Ms. Panther. Synthes stated that the job of "sales consultant" required an individual to spend time on hospitals calls, surgical observations, and surgeon office calls, using his or her product knowledge "to present, demonstrate, and ensure proper utilization of Synthes products" and to influence the purchase of such products. Synthes reported that Ms. Panther's position required her to work five days a week, seven and a half hours per day; sit for two hours, stand for five hours, walk for two hours, and drive for four hours; bend and stoop frequently, climb stairs occasionally, and push and pull occasionally; and lift between forty to eighty pounds. Similarly, Ms. Panther reported that her position as a sales consultant required her to train and assist surgeons and nursing staff at various hospitals in orthopedic procedures. Ms. Panther stated that her daily routine included unloading instrument trays from her car, transporting them to an operating room, assisting with the sterilization process of the instrument trays, standing by the surgeon and nursing staff during the surgical procedure, collecting the dirty instrument trays and decontaminating them, and reloading the instrument trays into the trunk of her car.[7] In short, Ms. Panther described her work as requiring repeated lifting of instruments and long periods of standing, which exacerbated her constant low back pain.

Ms. Forgiel also obtained vocational information by interviewing Mr. Martin Higgins, a purported expert in Synthes's "specialty field." Mr. Higgins previously "owned a company that specialized in selling technical medical supplies," worked for one of Synthes's competitors for several years, and sold medical products for a year. Mr. Higgins indicated that as a sales consultant, Ms. Panther would be required to unload

---

[7]      Ms. Panther stated in a June 2003 interview that the instrument trays weighed twenty to thirty pounds each, and that she would bring as many as six to eight trays to a hospital.

7

instruments from her car and transport them to the hospital. Mr. Higgins observed that each individual tray weighs about twenty pounds, so in order to lift eighty pounds, Ms. Panther would have to be unloading multiple trays at one time. Mr. Higgins stated that his routine consisted of unloading instruments from his car and transporting them to the hospital using a dolly, cart, or a wheelchair provided by the hospital. He said that hospital staff, not a sales consultant, would decontaminate the equipment due to liability issues. Mr. Higgins also asserted that a sales consultant would not stand beside the surgeon during a procedure, but would be outside the sterile field and possibly utilize a laser pointer as an instructional tool. Mr. Higgins, however, confirmed that a sales consultant stands during the procedure, which may be for a prolonged period considering the length of some back surgeries.

Relying on the Dictionary of Occupation Titles (the "DOT"), Ms. Forgiel determined that the occupation of a sales consultant/representative, or sales representative, dental and medical equipment supplies, best portrayed Ms. Panther's duties. The DOT described that occupation as routinely done as light. According to the DOT, a light occupation requires walking or standing to a significant degree, as well as exertion of up to twenty pounds of force occasionally (up to 1/3 of the time), and/or up to ten pounds of force frequently (1/3 to 2/3 of the time), and/or a negligible amount of force constantly (2/3 or more of the time) to move objects. Ms. Forgiel observed that the DOT contained over twenty categories of sales occupations and that DOT "overwhelmingly rated" these occupations as light, leading her to the determination "that the occupation of a SALES CONSULTANT, as routinely done in the economy, is light." Ms. Forgiel concluded that "it is confirmed and clear that how Ms. Panther performed her specific job was light with situations of prolonged standing," and that "[i]f Ms. Panther is able to lift 20 pounds occasionally and able to alternate her stand-sit-walk, it is reasonable to assume, from a vocational perspective, that she can safely perform the tasks

8

routinely done by SALES CONSULTANTS in a variety of settings."

On December 8, 2003, Sun Life sent a letter to Ms. Panther, which stated in part:

We have completed a review of your claim for Sun Life disability benefits.  At this time, we are unable to extend further benefits to you.

. . . .

Based on the policy definition of total disability, you are not eligible for benefits.

Your claim was initially approved based on the job description your employer provided, however, we have to look at your occupation of a Sales Consultant as it is routinely done in the labor market, not specifically your job.  We determined that this was not initially performed, so we recently had an occupation analysis done by a vocational rehabilitation consultant.

Once the occupational analysis was complete we asked our medical consultant to review all of the medical documentation in your file to see if it supported your inability to perform your occupation as it is routinely done in the labor market.

. . . .

The medical documentation does not support your inability to perform the light duty occupation of Sales Consultant as it is routinely done in the labor market.

Based on this information, at this time, you do not meet the contractual definition of disability and you are not eligible for benefits.  This review should have been done prior to the approval of your claim.  We have paid you benefits since January 5, 2003 at $12,656.30 a month for a total amount of $146,223.27.  Due to this being our error, we will not ask for this money back.

To avoid any financial hardship for you at this time we will pay you a benefit through January 31, 2004 in good faith.

Additionally, Sun Life's letter cited specific issues it had with Ms. Panther's claim of disability.  For instance, Sun Life asserted that lifting forty to eighty pounds was not a requirement of Ms. Panther's occupation, maintaining that an individual instrument tray weighed twenty pounds or less and could be transported to the hospital using a dolly or cart.  Medically, Sun Life noted the lack of:  a new MRI to indicate

9

that Ms. Panther's back condition worsened or improved; formal clinical notes from Dr. Arnold; evidence that Ms. Panther received a surgical opinion or needed surgery, despite her insistence that only surgical intervention would help her condition; and objective medical documentation to support Dr. Dunlap's limitations and restrictions.

Ms. Panther asked Sun Life to review its denial of benefits on December 18, 2003.  As part of her appeal, she provided Sun Life with a November 2003 neurological exam, as well as new MRI and EMG results that she received earlier in December.  Specifically, in November 2003, Dr. Arthur Allen, a neurologist, conducted an examination of Ms. Panther.  He diagnosed a right L5-S1 radiculopathy secondary to a right lateral disc protrusion and recommended that Ms. Panther undergo a repeat MRI, an EMG, and that she be referred for a surgical opinion.  In early December 2003, Dr. Allen performed an EMG/nerve conduction procedure on Ms. Panther.  He noted "subtle neurogenic changes in multiple right lower extremity muscles within L5 root distribution."  Dr. Allen also compared the results of the new MRI with the MRI from 1999, finding degenerative changes and a moderate diffuse bulging disc at L5-S1 that was "slightly larger" compared to the 1999 exam.  He observed that the remainder of the intervertebral discs did not indicate significant bulgings or protrusions.

Sun Life reaffirmed its denial in a letter to Ms. Panther's attorney dated February 5, 2004.  The letter stated that Dr. James Sarni, a board certified physician specializing in physical medicine and rehabilitation, reviewed the additional medical documentation provided by Ms. Panther.  Dr. Sarni determined that Ms. Panther's "MRI results appeared to be very similar to the results obtained in the 1999 study" and that the MRI data was consistent with basic, age-related degenerative findings.  Moreover, Dr. Sarni stated that "the EMG revealed only mild neurogenic changes that should result in no deficit" and characterized Dr. Allen's

interpretation of the data as "very aggressive." Dr. Sarni concluded that there was "essentially no data" to explain Ms. Panther's contention that she could not perform the usual duties of her occupation or "to indicate there is any physical impairment present whatsoever in Ms. Panther."

Sun Life's letter acknowledged that Ms. Panther's medical information reflected mild degenerative changes of her lumbar spine, resulting in occasional discomfort. Sun Life emphasized that Ms. Panther did not seek regular and appropriate medical intervention despite her repeated allegations of severe pain, and that the lack of significant findings in her "scant" medical records did not support a medical condition as severe as she alleged. In conclusion, Sun Life stated that while Ms. Panther should avoid heavy lifting and strenuous physical activity, she retained the capacity to perform the light physical activity required by a sales consultant:

> While [Ms. Panther] may assert that her job as she performed it was more strenuous than that which is described by the Dictionary of Occupational Titles, the definition of Total Disability is not concerned with an individual's *job*, but instead with her *occupation*. While it may be true that Ms. Panther cannot perform her job as she once did for her employer, this does not mean that she cannot perform that occupation for another employer or company, since it requires only light physical exertion.

(emphasis in original).

Plaintiff filed this action on April 30, 2004.

## II.  Procedural History

On May 18, 2005, Judge VanBebber made several rulings in this case. Panther v. Synthes (U.S.A.), No. 04-2183-GTV, 2005 WL 1185624 (D. Kan. May 18, 2005). First, Judge VanBebber determined that the LTD plan granted Sun Life discretion to determine whether plaintiff was eligible for long-term disability benefits, but it did not grant Sun Life discretion to interpret the LTD plan's terms. Id. at *3. As a result, Judge VanBebber concluded that the arbitrary and capricious standard of review, with a reduction of deference due

11

to Sun Life's conflict of interest, applied to Sun Life's eligibility decision, and that *de novo* review applied to Sun Life's interpretation of the LTD plan's terms. Id. at *4. Second, Judge VanBebber ruled that plaintiff could not obtain discovery beyond the administrative record. Id. at *6. Third, Judge VanBebber held, under *de novo* review, that the LTD plan term "own occupation" meant one's occupation as it is routinely performed in the labor market, as opposed to one's specific duties for a particular employer. Id. Fourth, Judge VanBebber ordered plaintiff to file a second amended complaint by May 31, 2005 or defendant Synthes (U.S.A.) Employee Benefit Plan would be dismissed from the case.[8] Id. at *10. Finally, Judge VanBebber permitted the parties to file supplemental briefing in support of, and in opposition to, Sun Life's pending motion for summary judgment in light of his prior rulings. Id. at *11.

### III. Standard of Review

"A denial of benefits challenged under § 1332(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). As mentioned above, Judge VanBebber ruled on May 18 that the LTD plan granted Sun Life discretion to determine eligibility for benefits. Accordingly, an arbitrary and capricious standard of review applies to Sun Life's decision. Charter Canyon Treatment Ctr. v. Pool Co., 153 F.3d 1132, 1135 (10th Cir. 1998) (citation omitted). Under this standard of review, the court generally considers only "the arguments and evidence before the administrator" at the time of the decision. Sandoval v. Aetna Life & Cas. Ins. Co., 967 F.2d 377, 380 (10th Cir. 1992). "The Administrator's decision need not be the only logical one or even the

---

[8]    Plaintiff did not file a second amended complaint. Accordingly, the court dismisses defendant Synthes (U.S.A.) Employee Benefit Plan without prejudice.

best one.  It need only be sufficiently supported by facts within his knowledge to counter a claim that it was arbitrary or capricious.  The decision will be upheld unless it is not grounded on any reasonable basis." Kimber v. Thiokol, 196 F.3d 1092, 1098 (10th Cir. 1999) (alterations, quotations, and citations omitted).

In his May 18 Memorandum and Order, Judge VanBebber also recognized that less deference must be granted to Sun Life's decision because it operated under a conflict of interest: Sun Life is both the claims adjudicator and the claims payor.  Specifically, the Tenth Circuit has adopted the "sliding scale" approach, which requires the reviewing court to "apply an arbitrary and capricious standard, but the court must decrease the level of deference given to the . . . decision in proportion to the seriousness of the conflict." Chambers v. Family Health Plan Corp., 100 F.3d 818, 825-27 (10th Cir. 1996).  Because an inherent conflict of interest exists in this case, Sun Life "bears the burden of proving the reasonableness of its decision" under the traditional arbitrary and capricious standard.  Fought v. UNUM Life Ins. Co. of Am., 379 F.3d 997, 1006 (10th Cir. 2004).  This requires the court to "take a hard look at the evidence and arguments presented to the plan administrator to ensure that the decision was a reasoned application of the terms of the plan to the particular case, untainted by the conflict of interest." Id.[9]

---

[9]     Although defendant brings this motion pursuant to Fed. R. Civ. P. 56(c), the court does not examine defendant's motion under the traditional summary judgment standard.  The court joins other district courts in this circuit which have applied the Tenth Circuit's decision in Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1579 & n.31 (10th Cir. 1994), and held that the summary judgment standard is not the proper standard when evaluating a denial of ERISA benefits under arbitrary and capricious review.  See e.g., Caldwell v. Life Ins. Co. of N. Am., 37 F. Supp. 2d 1254, 1257 (D. Kan. 1998), rev'd on other grounds, 287 F.3d 1276 (2000); Clausen v. Standard Ins. Co., 961 F. Supp. 1446, 1455 (D. Colo. 1997).  Instead, the court acts as an appellate court and evaluates the reasonableness of a plan administrator or fiduciary's decision based on the evidence contained in the administrative record.

## IV.  Discussion

Defendant Sun Life   maintains that its decision denying plaintiff long-term disability benefits was reasonable because plaintiff failed to present satisfactory evidence that she was totally disabled from her occupation.

At the outset, defendant points out that Dr. Dunlap, plaintiff's own physician, stated in two separate attending physician statements that her disability began on November 17, 2002.  Defendant argues that this evidence alone demonstrates that plaintiff was not disabled from October 1, 2002 to November 16, 2002. Defendant also observes that plaintiff first complained of her back problems in May 1999, but continued working at Synthes for another three years, even during her second pregnancy.   When plaintiff left Synthes, defendant notes that her reason for leaving related to the birth of her second child, not a back problem.

Defendant next argues that substantial evidence supported that plaintiff was capable of performing her own occupation.  First, defendant asserts that there is no medical explanation why plaintiff was able to work from April 1999 until October 2002 before allegedly becoming totally disabled.  While the MRI in 1999 disclosed a back problem, defendant argues that it was not totally disabling because she continued to work. Defendant states that neither Dr. Arnold's report nor Dr. Allen's report explains whether or why plaintiff's back condition drastically changed in October 2002, and that Dr. Sarni opined that the December 2003 MRI showed only "slightly larger" bulging as compared to the May 1999 MRI.   Moreover, defendant cites Dr. Foster's opinion that plaintiff's medical documentation was not the "standard documentation" for a person "with a severe back problem who is totally incapable of doing her job at this present time when she was able to do it previously."    Second, defendant argues that plaintiff could perform the light physical exertion required to function as a sales consultant.  In support, defendant relies on Ms. Forgiel's job analysis, which concluded that

14

both plaintiff's job at Synthes and her occupation as a sales consultant were light duty.  Defendant contends

that plaintiff did not offer evidence that sales consultants have to perform heavy lifting or stand for extended

periods.  It is defendant's position that light duty "fell . . . within the restrictions proposed by [p]laintiff's own

physicians."  Defendant also relies on Dr. Sarni's conclusion that there was not sufficient evidence that plaintiff

was incapable of performing her usual duties or continuing her usual lifestyle.  Finally, defendant argues that the

reports from plaintiff's physicians–particularly Dr. Dunlap– are based on plaintiff's subject complaints to them.

Defendant states that Dr. Dunlap was the only physician who provided an opinion that Ms. Panther was totally

disabled, but he was not a neurosurgeon, orthopedist, or a doctor specializing in physical medicine or

rehabilitation.

Despite defendant's contentions, the court finds that its decision denying plaintiff long-term disability

benefits was arbitrary and capricious based on the present administrative record.  The combination of

defendant's failure to refer plaintiff to an independent medical expert for examination and failure to adequately

support the grounds for its denial leads to the conclusion that defendant did not conduct a full and fair review

of plaintiff's claim.

First, substantial medical evidence does not exist to support the decision that plaintiff can perform the

material and substantial duties of her own occupation.  Defendant's denial letter, dated December 8, 2003,

informed plaintiff that a "medical consultant" reviewed her medical documentation and determined that it did

not support her inability to perform the duties of a light occupation; specifically, a sales consultant as it is

routinely done in the labor market.  Absent from the administrative record, however, is any documentation from

a "medical consultant" analyzing her ability to perform her occupation as it is routinely done in the labor market.

The record contains only in-house memoranda from Dr. Foster and Dr. Sarni, which lack sufficient explanation

15

to substantiate their opinions.  In a conclusory fashion, Dr. Foster's May 2003 memo opines that plaintiff's

medical files were not the standard documentation for a person with a severe back problem, while Dr. Sarni's

February 2004 memo, dated after defendant's denial letter, concluded that no data indicated "any physical

impairment present . . . whatsoever" to show that she was unable to perform her "usual duties."  The court is

troubled by defendant's reliance on these in-house opinions because they are based not on an examination of

plaintiff or discussions with plaintiff's treating physicians, but rather a mere paper review of plaintiff's medical

file.

        In light of defendant's inherent conflict of interest, defendant should have obtained an independent

medical examination.  See Fought, 379 F.3d at 1015 ("We note that, while not required, independent medical

examinations are often helpful. . . .  Where, as here, a conflict of interest may impede the plan administrator's

impartiality, the administrator best promotes the purposes of ERISA by obtaining an independent evaluation.").

Even Dr. Foster, defendant's own physician, recommended that a neurosurgeon, orthopedist, or a spine

surgeon evaluate plaintiff in order to produce a reasonable determination about her restrictions and evaluations.

The court realizes that defendant scheduled plaintiff for an independent medical examination in June 2003, but

plaintiff objected to the specific doctor.  Instead of finding another doctor, defendant decided to conduct a

face-to-face interview with plaintiff and attempted to retrieve Dr. Arnold's treatment records.  This was not

an adequate substitute under these circumstances.  Dr. Dunlap, plaintiff's treating physician, opined in his

attending physician statement that plaintiff was totally disabled.  While the law does not require defendant to

give the opinion of a treating physician controlling weight in an ERISA case, Black & Decker Disability Plan

v. Nord, 538 U.S. 822, 834 (2003), defendant's choice to discount Dr. Dunlap's opinion, as well as plaintiff's

other treating physicians, without obtaining an independent evaluation was unreasonable.  See Caldwell v. Life

Ins. Co. of N. Am., 287 F.3d 1276, 1289 (10th Cir. 2002) (concluding that a court should "give less deference if a plan administrator fails to gather or examine relevant evidence"); Omasta v. Choices Benefit Plan, 352 F. Supp. 2d 1201, 1206 (D. Utah 2004) (stating that "the presence of conflicting evidence on the disability issue is a factor that the court considers in making its determination of whether the administrator's decision to deny benefits was arbitrary and capricious.). In short, the absence of an independent examination demonstrates that defendant did not conduct a thorough investigation of plaintiff's claim.

The grounds for defendant's decision to deny plaintiff benefits also gives the court pause. Defendant initially concluded that plaintiff was totally disabled when it considered the actual work she performed. After paying plaintiff almost $147,000 in benefits over a twelve-month period, defendant reversed its determination. Defendant did not cite an improvement in plaintiff's medical condition for the decision. Rather, it concluded that plaintiff's "own occupation" was much broader than her job at Synthes and that plaintiff could perform the light occupation of sales consultant as it is routinely performed in the labor market. In support, defendant relied on Ms. Forgiel's job analysis and the aforementioned "medical consultant" that allegedly reviewed plaintiff's medical records.

Plaintiff claims that her back problems prevent her from lifting forty to eighty pounds and standing for long periods of time. These job duties are consistent with the requirements reported by Synthes. It appears that Ms. Forgiel accepted the job characterization provided by her interview with Mr. Higgins. Mr. Higgins disputed the eighty pound lifting requirement, stating that instrument trays weigh only twenty pounds, and that from his experience a cart or dolly was provided to transport the equipment. He verified, however, that plaintiff's job would require prolonged standing. As a result, Ms. Forgiel concluded that "[i]f Ms. Panther is able to lift up to 20 pounds occasionally and alternate her stand-sit-walk, . . . she can safely perform the tasks

routinely done by SALES CONSULTANTS in a variety of settings." As plaintiff points out, neither Ms. Forgiel's report nor the administrative record provides a clear determination of what plaintiff's occupation was: the specialized position of an orthopedic implant sales consultant or a generic sales position interchangeable in a variety of markets. It is also not evident what defendant considered to be "the material and substantial duties" of plaintiff's occupation, and which duty or duties, if she was unable to perform, were sufficient to preclude her from continuing in her occupation. This leaves the court with little or no basis for evaluating Ms. Forgiel's conclusion. Moreover, the court notes that Ms. Forgiel premised her opinion on plaintiff's ability to lift twenty pounds. Dr. Dunlap, however, stated that plaintiff was not capable of lifting over ten to fifteen pounds.

Even assuming that defendant properly evaluated the material and substantial duties of plaintiff's own occupation, the court still questions defendant's undocumented assertion in its December 8, 2003 letter that a "medical consultant" concluded that plaintiff could perform a light occupation. Furthermore, in its brief, defendant argues that light duty "fell . . . within the restrictions proposed by [p]laintiff's own physicians." This statement is puzzling, as Dr. Dunlap concluded that plaintiff was not capable of performing even sedentary work.

Having determined that defendant's decision was arbitrary and capricious, the next issue is whether the court should order defendant to reinstate plaintiff's long-term disability benefits or whether the court should remand the case to defendant for further consideration of the merits of plaintiff's disability claim. See Omasta, 352 F. Supp. 2d at 1206 (citation omitted) ("In making its decision [whether the denial of benefits was arbitrary and capricious], the court may affirm the administrator's decision, reverse that decision and award benefits, or remand for further proceedings."). The court finds that a remand to defendant is the appropriate course of action in this case.

18

"The remedy when an ERISA administrator fails to make adequate findings or to explain adequately the grounds of her decision is to remand the case to the administrator for further findings or explanation." Caldwell, 287 F.3d at 1288 (citations omitted); see also Gaither v. Aetna Life Ins. Co., 394 F.3d 792, 809 (10th Cir. 2004) (determining that the plan administrator's decision was arbitrary and capricious and subsequently remanding the case to the plan administrator "to reconsider its decision in light of the entire record, and to request and obtain additional documentation if necessary to determine [the claimant's] eligibility for disability benefits.'"). "A remand for further action is unnecessary only if the evidence clearly shows that the administrator's actions were arbitrary and capricious, . . . or 'the case is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground." Caldwell, 287 F.3d at 1289 (citations omitted).

Although the court determines that defendant's decision was arbitrary and capricious, it must remand the case to defendant because the case is not so "clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground." Id. The shortcomings identified in the administrative record carry more weight because of defendant's conflict of interest and the unique circumstances presented by defendant's initial payment of benefits followed by a benefit termination due to the LTD plan's definition of "own occupation." The court would be remiss, however, if it did not acknowledge the weaknesses of plaintiff's claim. Plaintiff continued to work at Synthes for three years after she hurt her back in April 1999, and then suddenly claimed total disability after giving birth to her second child in October 2002. This alone raises some questions about her claim. Moreover, while Dr. Dunlap opined that plaintiff was totally disabled, he is an internal medicine specialist, not a neurosurgeon, orthopedist, or spine surgeon. Finally, the best objective medical evidence of plaintiff's deteriorated condition is an MRI from December 2003 showing

19

a "slightly larger" disc bulge at L5-S1 as compared to her MRI results from May 1999. Had defendant obtained an independent medical examination from a specialist, and had that expert evaluated plaintiff and her medical record and concluded that plaintiff's back condition did not preclude her from performing light work, the court would likely uphold defendant's denial of benefits. But that is not the case here.

The court remands the case to defendant for further investigation into the merits of plaintiff's disability claim in accordance with this opinion. At a minimum, an independent medical investigation should be conducted by a specialist to assess plaintiff's medical condition, including an evaluation of her physical restrictions and limitations. Additionally, defendant should clarify in the administrative record what it considers to be plaintiff's own occupation, the material and substantial duties of plaintiff's own occupation, and which duty or duties plaintiff needs to be unable to perform to qualify as totally disabled. Lastly, defendant should permit plaintiff to supplement the administrative record with any new medical evidence she has obtained since February 2004 regarding her back condition.

**IT IS THEREFORE BY THE COURT ORDERED** that defendant Sun Life's motion for summary judgment (Doc. 22) is denied. The case is remanded to defendant Sun Life for further proceedings consistent with this opinion.

**IT IS FURTHER ORDERED** that defendant Synthes (U.S.A.) Employee Benefit Plan is dismissed without prejudice.

20

**IT IS SO ORDERED** this 28th day of June, 2005.


s/ John W. Lungstrum
John W. Lungstrum
United States District Judge